DECISION AND JUDGMENT ENTRY
{¶ 1} Jessica Horton appeals her adjudication as a delinquent child for the act of arson, arguing that it is based on insufficient evidence and against the manifest weight of the evidence. Acting in our capacity as the thirteenth juror, we conclude the state failed to prove beyond a reasonable doubt that Horton knowingly started or accelerated the fire. We base this conclusion on the improbability of the timeline for the sequence of events that the state presents; the illogical conclusions of the state's expert testimony; and statements and omissions by Horton's stepmother, which logically can only be construed to support Horton's contention that the fire was accidental. Accordingly, we sustain Horton's second assignment of error on the basis that the judgment is against the manifest weight of the evidence.
 I. {¶ 2} The State filed a complaint charging Horton with delinquency for the act of arson. The State sought to prove that Horton knowingly set fire to her bedroom with Wanda Whitehead, her stepmother, inside the home and/or knowingly re-ignited the fire after Whitehead extinguished it. Horton defended on the theory that burning candles accidentally ignited the fire while she was asleep; she also denied re-igniting the fire.
 {¶ 3} At the dispositional hearing, Whitehead testified that she awoke in the early morning to the sound of her dogs barking and cracking noises. She observed light coming from Horton's bedroom and ran to it, where she found Horton dressed and standing in the doorway looking into the bedroom. Whitehead observed a fire on the floor beside Horton's bed, so she ordered Horton to find the telephone to call 911. Meanwhile, she ran to the living room for the five gallon bucket of water used to catch water from a roof leak. She returned to the bedroom and poured the water onto the fire, which was burning on a pile of clothing. Whitehead testified that before she extinguished the fire, she saw a number of burning candles along the floor.
 {¶ 4} After she dumped water on the fire, Whitehead asked Horton to open the patio doors located in the bedroom so she could bring in the garden hose to insure the fire was out. Horton responded she could not open the door because it was blocked, so Whitehead ran out of the house to bring the hose through the front door. When Whitehead returned to the front porch with the hose, Horton came out of the house and was on the telephone. Whitehead could not get the hose into the bedroom because of its length. When she returned to the bedroom she found it "totally engulfed in flames." Whitehead also testified that she heard explosions, and that items in the bedroom were flying at her upon her return. At that point, Whitehead ran from the house.
 {¶ 5} On cross-examination, Whitehead testified that a wall in Horton's bedroom adjoined a storage closet. Whitehead stated that she kept five kerosene lamps in the home; two in the entranceway, two in the archway, and one in the kitchen. She testified that the storage closet contained no kerosene lamps. She acknowledged that she had stored kerosene lamps in the closet, but stated that she removed them a few months before the fire. She also acknowledged that the closet did contain paint thinner and other combustible products. Whitehead testified that Horton placed the phone call to the fire department as she had instructed. She also testified that it took her approximately one to two minutes to douse the fire with water from the bucket, go outside the house, and return with the water hose. Finally, Whitehead testified that she heard the breaker, which was located on the far side of the storage closet, "kick" as she was fleeing the home.
 {¶ 6} On re-direct, Whitehead testified that except for her purse, she was unable to save any of her personal belongings before fleeing the home. However, when she and Horton arrived at a hotel that morning, Horton had several personal items, including a stereo, a bag of make-up, and clothing in Whitehead's car. She identified Horton's clothing as five pairs of blue jeans, shirts, bras, and underwear. Whitehead testified that these items were not in her car when she brought it home from work the evening before the fire. Whitehead also testified that before the fire she heard Horton continuously run in and out of the house.
 {¶ 7} Robert Dunn, who is an investigator with the State Fire Marshall, testified as the State's expert witness. His duties are to conduct "origin and cause investigations" on fires and to assist in arson prosecutions. Dunn visited the fire scene, conducted an over-view scene investigation, took photographs, and collected evidence. He also conducted interviews with Whitehead and Horton in order to obtain background information. Dunn testified that his investigation concluded "that there were no accidental sources of ignition" in the vicinity where the fire originated and found that it was an intentionally set fire. He admitted that he took no samples from the home to determine the presence of accelerants because he felt he could not collect viable samples due to the intense burning and damage.
 {¶ 8} Dunn also testified that he found the remains of three kerosene lamps in the area where the fire originated. Dunn believes the kerosene lamps played a role in the fire and concluded that the lamps were removed from either the living room or kitchen and dumped onto the fire. Furthermore, Dunn testified that the bedroom where the fire ignited was essentially reduced to ash, which indicated that the fire was rapid and intense. Dunn concluded that an accelerant caused the rapid and intense fire that consumed the Whitehead home.
 {¶ 9} Dunn acknowledged he learned that the storage closet adjoining an interior wall in Horton's bedroom contained paint-type materials. He testified these products would have contributed to the fire once it was past the incipient stage, but concluded they did not contribute to its initial spreading. Dunn stated that when Whitehead poured water on the fire, the fire was just beginning to enter the incipient stage and that after Whitehead left the home to retrieve the garden hose, the fire was accelerated by the kerosene lamps.
 {¶ 10} On cross-examination, Dunn admitted that he arrived at the scene of the fire two days after the event. Dunn also acknowledged that Whitehead's interview had an impact on his investigation. Dunn testified that Whitehead did not inform him that she observed candles burning when she entered the room to extinguish the fire. But he stated he knew they were present from his interview with Horton. Dunn admitted that a candle could cause a fire and that his investigation revealed that the fire originated on clothing and bedding materials located on the floor. However, on re-direct, Dunn testified that if the clothing were baby clothes it would not "readily propagate or burn openly" because baby clothes are flame retardant and difficult to ignite.
 {¶ 11} He also testified on cross-examination that he assumed the fire department used water hoses to extinguish the fire. He admitted that he informally spoke with the firefighters about the incident, rather than formally interviewing them. Dunn also indicated that standard fire fighting procedure includes firefighters walking around the perimeter of the fire area and moving materials in order to gain access to areas on fire. Dunn acknowledged that the high pressure hoses could move and redeposit materials, such as the lamps, in an interior fire.
 {¶ 12} Dunn testified that Whitehead did not inform him that she heard a cracking sound when she awoke. He admitted that such information could be significant to an investigation because it indicates that the fire may have been past the incipient stage and in a more developed stage of growth when Whitehead awoke and discovered the fire.
 {¶ 13} The trial court also questioned Dunn about the direction the fire traveled. Dunn testified that two separate events occurred: "One was a small fire that [Whitehead] discovered and extinguished or all but extinguished with a bucket of water. While she was out * * * trying to get the garden hose, the oil lamps were introduced and we had another ignition along the wall * * *."
 {¶ 14} Coy Whitehead, Horton's father, testified for the defense. Coy was not home on the night of the fire. He testified that a bucket was used to catch water from a roof leak, but stated that he never saw the bucket more than half full. He also testified that he saw three to four kerosene lamps stored in the closet that adjoins an interior wall in Horton's bedroom. Coy stated that there was insulation and two by four wood paneling between the bedroom wall and the storage closet, but that he could not remember if there was drywall between the wall and closet.
 {¶ 15} Horton testified she lit fifteen to twenty candles in her room in the early morning because the electricity was out. Some of the candles were not in containers. She placed the candles on the arm of her sofa bed, her dresser, and wicker baskets. Horton fell asleep with the candles still burning and she awoke when she heard dogs barking and Whitehead scream. When she turned over in her bed, she observed that the wall adjoining the storage closet was on fire. She then put on clothing and left the room. On her way out of the room, she ran into Whitehead who told her to call the police. Horton took the phone from her bedroom, went outside the house, and called the fire department. She never returned to the house, except once when Whitehead shouted for her to open the patio doors in the bedroom. But even then she did not return to the bedroom. Horton did not see Whitehead douse the flames with water from the bucket, and was already outside when Whitehead went to retrieve the water hose.
 {¶ 16} Horton admitted that she had a stereo and make-up bag in Whitehead's car, but stated that she took them outside to play in the evening. She testified that she often took her stereo out into the car so that she could play music loudly. Whitehead had acknowledged this routine in her testimony. Horton testified that a friend gave her clothing the day after the fire, and stated that none of her clothes, other than those she wore when she left the house, survived the fire. Horton also testified that she saw several oil lamps in the storage closet the day before the fire. She believes the fire started from one or more of the candles.
 {¶ 17} The trial court adjudicated Horton delinquent by the act of arson and ordered Horton committed to the care and custody of the Ohio Department of Youth Services.
 {¶ 18} Horton appeals and raises the following assignments of error:
[I.] The trial court violated Jessica Horton's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Section 16 of the Ohio Constitution, and Juv.R. 29(E)(4) when it adjudicated her delinquent of two counts of arson absent proof of every element of the charge against her by sufficient, competent, and credible evidence.
[II.] The trial court violated Jessica Horton's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution when it adjudicated her delinquent of two counts of arson, when that finding was against the manifest weight of the evidence.
[III.] Jessica Horton was denied her constitutional right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution when her attorney stipulated to the qualifications of the State's expert and when counsel failed to call their own expert.
 II. {¶ 19} In her first assignment of error, Horton argues that the state did not present sufficient evidence to prove that she "knowingly" caused the fire.
 {¶ 20} A trial court may find a juvenile delinquent when the evidence demonstrates, beyond a reasonable doubt, that the child committed an act which would have constituted a crime if committed by an adult. R.C.2151.35(A); Juv.R. 29(E)(4). When we review the sufficiency of the evidence, we must examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citingJackson v. Virginia (1979), 443 U.S. 307. This challenge tests whether the state's case is legally adequate to go to the factfinder in that it contains prima facie evidence of the elements of the charged offense. We employ this standard in both the juvenile context and in criminal convictions. In re Pollitt (Oct. 10, 2000), Adams App. No. 00CA687, citing In re Watson (1989), 47 Ohio St.3d 86, 91.
 {¶ 21} R.C. 2902.02(A)(1)-(2) states: "No person, by means of fire or explosion, shall knowingly do any of the following:
(1) Create a substantial risk of serious physical harm to any person other than the offender; (2) Cause physical harm to any occupied structure." Thus, the State was required to prove that Horton, by means of fire or explosion, knowingly created a substantial risk of serious physical harm to another and knowingly caused physical harm to an occupied structure.
 {¶ 22} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). In essence Horton contends the fire originated from her negligent behavior of leaving burning candles around the room, rather than a deliberate act.
 {¶ 23} Commonly, there is no direct evidence of a defendant's state of mind so the state must rely on circumstantial evidence to satisfy this element of its case. A defendant's state of mind may be inferred from the totality of the surrounding circumstances. Pollitt, supra, citing Statev. Ratajczak (Aug. 5, 1992), Lorain App. No. 91CA005245; see, also Statev. Logan (1979), 60 Ohio St.2d 126, 131. Circumstantial and direct evidence posses the same probative and evidentiary value. Id., citingState v. Jenks (1991), 61 Ohio St.3d 259, 272. When viewing circumstantial evidence, "`the weight accorded an inference is fact-dependent and can be disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence.'" Id., quoting Wesley v. The McAlpin Co. (May 25, 1994), Hamilton App. No. C 9305286, citing Donaldson v. Northern Trading Co.
(1992), 82 Ohio App.3d 476, 483.
 {¶ 24} While the State presented no direct evidence that Horton "knowingly" caused the fire, it did introduce enough circumstantial evidence of her intent to pass the sufficiency test. For example, the State presented testimony that: (1) Horton repeatedly went in and out of her home before the fire; (2) Horton placed several of her personal belongings, including a stereo, make-up, and clothing, in Whitehead's car prior to the fire; and (3) Whitehead observed the clothing at the hotel, while Horton claimed it was given to her by a friend the day after the fire. An expert witness testified that (1) the fire was not accidental in origin and (2) kerosene lamps re-ignited the fire, causing it to burn in a rapid and intense manner. Whitehead indicated that Horton was the only person in the room at the time the fire began. Whitehead also testified there were no kerosene lamps in Horton's room and that she had removed the lamps from the closet adjoining a wall in Horton's room several weeks prior to the fire. The totality of this evidence, if believed, would allow a reasonable trier of fact to infer that Horton knowingly caused the fire.
 {¶ 25} Horton also argues that the State failed to introduce sufficient evidence to establish she re-ignited the fire with kerosene lamps. However, there is sufficient circumstantial evidence to allow this issue to go to the factfinder. For instance, (1) the expert witness testified that the kerosene lamps acted as an accelerant; (2) both Whitehead and Horton testified that Horton did not keep any kerosene lamps in the bedroom; (3) Whitehead testified that she removed the kerosene lamps from the closet several weeks prior to the fire; and (4) Whitehead testified that Horton did not leave the house until after Whitehead returned to the front porch with the water hose. This evidence, if believed, could allow reasonable inference that Horton re-ignited the fire with the kerosene lamps after Whitehead extinguished it with water.
 {¶ 26} Accordingly, we conclude that the state's evidence passes the sufficiency test and we reject Horton's first assignment of error.
 III. {¶ 27} In her second assignment of error, Horton argues that the trial court's judgment is against the manifest weight of the evidence. Horton contends we must reverse the judgment because (1) the weight of the evidence indicates the burning candles accidentally started the fire and (2) the State failed to prove she re-ignited the fire with kerosene.
 {¶ 28} The test for determining whether a conviction is against the manifest weight standard is much broader than that for examining the sufficiency of the evidence. Although a verdict is supported by sufficient evidence, a court of appeals may nevertheless conclude that the verdict is against the manifest weight of the evidence. State v.Banks (1992), 78 Ohio App.3d 206, 214, 604 N.E.2d 219. A sufficiency of the evidence challenge tests whether the state's case is legally adequate to go to the factfinder in that it contains prima facie evidence of all the elements of the charged offense. State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717; Carter v. Estell (C.A.5, 1982), 691 F.2d 777, 778. A weight of the evidence argument tests the rational adequacy, i.e., persuasiveness, of the evidence. The two tests are distinct, notwithstanding dicta to the contrary in State v. Jenks
(1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492. See State v. Thompkins,78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541 (Cook, J., concurring). In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. State v. Thompkins (1997),78 Ohio St.3d 380. We also apply this standard to juvenile delinquency adjudications. In re Tripp (Oct. 1, 2001), Hocking App. No. 01CA8.
 {¶ 29} We are loath to second guess the trial judge, who conscientiously performed his role in this case. But the number of holes in the state's case compels us to conclude that the state did not carry its burden of proof beyond a reasonable doubt to establish Horton intentionally set or accelerated the fire. "Proof beyond a reasonable doubt" is "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs." R.C. 2901.05(D). After carefully considering the evidence, we cannot say we are firmly convinced of the truth of the charge as required to sustain the conviction. We base our conclusion upon the weaknesses of three general areas of evidence: the time frame, the expert's testimony and Mrs. Whitehead's testimony.
 Mrs. Whitehead's Testimony {¶ 30} Whitehead testified at trial that she awoke to cracking noises, which indicates the fire was far beyond the incipient stage at that point. However, she omitted this critical information when being interviewed by the state's expert, Mr. Dunn. Moreover, she indicated her dogs were barking, apparently in response to the fire. While she didn't indicate whether they were inside or outside, given the small nature of the cottage and the lack of testimony as to the dogs' location or removal during the fire, we assume they were outside. We seriously question whether an incipient, smoldering fire would cause the dogs to go on alert. More likely, they responded to a "crackling fire," again indicating the fire was advanced by the time Whitehead awoke. She also stated she saw lots of smoke, which indicates the fire had been going for some time.
 {¶ 31} Whitehead believes that Horton went throughout the house gathering kerosene lamps from various rooms and ultimately dumped them on a smoldering fire. Yet she never mentions smelling kerosene on Horton or her clothes later that evening. It's almost inconceivable that Horton could dump oil from three lamps without getting it all over herself. In order to dump the contents, Horton would have had to remove the globes, unscrew the wicks and then dump the contents without spilling any kerosene on herself. This seems an almost impossible task given the timeline, which we will discuss below.
 Arson Investigator's Testimony {¶ 32} We acknowledge that the expert's conclusions support the state's theory of the case. But these conclusions are based upon assumptions that were proven by the state's other witness to be false. Because the expert had no objective or scientific basis for his opinions, and in light of their faulty premise, we reject them as illogical.
 {¶ 33} Interestingly, the expert never framed any of his opinions in terms of a reasonable degree of professional certainty. While there was no objection on this basis, we deem the lack of certainty to be troublesome when viewed in conjunction with another fundamental problem. The expert was certain that Whitehead neglected to tell him she awakened to a crackling fire. At trial, she was equally certain that the crackling noises awoke her. Based on the interview information, the expert concluded that the fire was in the incipient stages when Whitehead awoke. But he acknowledged that crackling clearly indicates an advanced stage of the fire. The only plausible source of the cracking sounds Whitehead heard was the wooden wall and closet, not a pile of smoldering clothing. Thus, his opinion was based on inaccurate information and should have been discounted. If the fire was advanced when Whitehead awoke, it could have easily reached the closet, and the flammable material stored in it, by the time Whitehead returned with the hose. Thus, the expert's theory about the existence of a second accelerant would be true, but with the noticeable exception that Horton was not its source. Rather the flammable materials in the closet were. The expert's conclusion that there was only a smoldering fire, which could not have spread without Horton dumping kerosene on it, is highly suspect. Moreover, his conclusion that "there were no accidental sources of ignition" in the area where the fire started also seems dubious given the unrefuted testimony that Horton left burning candles all over the bedroom.
 The Timeline {¶ 34} Whitehead testified that it took her between one to two minutes to dump water on the fire, retrieve the hose from outside and return to the house. According to the state's theory, in those 60-120 seconds, Horton had to go to the hallway, the kitchen, and living room to get the lamps, return to the bedroom to empty them on the smoldering fire, grab her telephone, place a call to 911, and then walk outside the house where Whitehead saw her as Whitehead returned with the hose. And she had to have done all this without spilling kerosene on herself. In addition to believing that sequence of events occurred so quickly, we would also have to conclude that the fire went immediately from smoldering to such a roaring inferno that it engulfed the entire bedroom, causing the flammable liquids in the closet to explode, burnt through the wall to the breaker box and consumed the wiring, all within a minute. Based on the state's evidence, such a conclusion is illogical. Rather, it is much more probable that the fire ignited accidentally from the candles, spread to the wall and started crackling by the time Whitehead awoke. When it reached the closet, it ignited the flammable liquids there and became the inferno Whitehead saw when she returned to the bedroom.
 {¶ 35} Because we are not firmly convinced that the state established Horton acted intentionally in causing the fire or that she accelerated it, we sustain her second assignment of error.
 IV. {¶ 36} In her third and final assignment of error, Horton argues that she did not receive effective assistance of counsel. Because we sustained Horton's second assignment of error, this assignment of error is now moot. Accordingly, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.
Judgment reversed and cause remanded.