[Cite as *State v. Scott*, 2017-Ohio-9316.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27445 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-1136 |
| | : | |
| TONY L. SCOTT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of December, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

KIM BUI, Atty. Reg. No. 0078021, 8080 Beckett Center Drive, Suite 112, West Chester, Ohio 45069
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Tony Scott appeals from his conviction and sentence for tampering with evidence. Scott contends that the conviction must be reversed because the State failed to present evidence sufficient to prove the elements of the offense and because the conviction is not supported by the weight of the evidence. He further contends that the trial court abused its discretion by permitting the introduction of evidence he claims is prejudicial. Finally, he contends that the trial court erred in sentencing.

{¶ 2} We conclude that the record demonstrates evidence sufficient to sustain the conviction and that the jury did not lose its way in finding that Scott was guilty of tampering with evidence. We further conclude that the trial court did not abuse its discretion with regard to the admission of evidence. Finally, we find no error in sentencing.

{¶ 3} Accordingly, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶ 4} This case arises from the September 30, 2013, shooting death of Dominque Gentry. On that date, Gentry and his friend, David Banks, were in Gentry's vehicle. Gentry was driving a black Chevrolet Tahoe and Banks was in the passenger seat. At approximately 7:28 p.m., they arrived at the All-in-One gas station located in Dayton. Gentry went into the building, made a purchase, and then returned to the car. Banks was helping another man jumpstart the man's vehicle. At approximately 7:58 p.m., Gentry and Banks left the gas station with the intent to go to Gentry's home.

{¶ 5} According to Banks, they pulled out of the rear of the parking lot onto

Clemmer Street behind a black SUV and a red Cadillac. All three vehicles then turned left onto Edison Street. As the vehicles approached Orchard Avenue, Banks observed the Cadillac swerve toward the front of the black SUV. He then observed the driver's side door of the Cadillac open. He also saw a red beam of light shining out of the Cadillac. He noted that the black SUV remained beside the Cadillac. Banks heard gunshots which caused him to duck down underneath the dashboard. When the shooting ended, Banks heard the squeal of tires as the SUV and Cadillac drove away. Banks then saw that Gentry was dead from a gunshot to the head. Banks exited the car and called 911.

{¶ 6} Dayton Police Officer Darryl Letlow was the first to arrive on the scene. He observed Gentry's vehicle which had run through a chain-link fence and into a home located at the intersection of Orchard and Edison. Letlow also observed automobile debris and shell casings in the roadway leading up to the vehicle. Letlow, after observing Gentry in the driver's seat, called for paramedics and backup officers. Letlow made contact with Banks, placed him in a cruiser, and then began to secure the scene.

{¶ 7} Dayton Police Detective David House was assigned to investigate the shooting. When he arrived on the scene, he observed the debris in the roadway including the entire rear window of a vehicle. The window was shattered, but was held together by the dark window tinting. The debris in the street, including specifically the pieces of a broken taillight, led House to believe that a Pontiac G6 had been involved in the crash.[1]

---

[1] At that time, House was driving a Pontiac G6 as his City of Dayton vehicle. According to House, the "G6 has a pretty distinctive rear taillight assembly in terms of the shape of it * * * and a small circular portion [in the middle of the taillight]." Tr. p. 373.

**{¶ 8}** House spoke to Banks which led him to direct Detective Rod Roberts and other officers to obtain video surveillance from the gas station. Roberts obtained video footage from the gas station for the hour prior to the shooting. Based upon his review of the surveillance tape and his conversation with Banks, House determined that there were three suspect vehicles; a black Ford Escape, a gray Pontiac G6 and a maroon two-door Cadillac Eldorado with a sunroof.[2]

**{¶ 9}** The surveillance footage shows Gentry's vehicle arriving in the gas station lot at 7:28 p.m. Gentry enters the gas station store and returns to the lot. At 7:45 p.m., the three suspect vehicles enter the parking lot. The Ford Escape is followed by the Pontiac with the Cadillac in the rear. The driver of the Escape exits the vehicle and enters the store. The driver is wearing an orange t-shirt and a black camouflage baseball cap with an emblem on the front and side as well as a shiny metallic emblem on the bill. As the driver exits the store, an orange fastener can be seen on the back of the cap. The driver then begins to put gas into the Escape. There is interaction between the Escape driver and the occupants of the other two vehicles. The three suspect vehicles leave the lot in the same order they arrived. Gentry's vehicle leaves the lot at the same time and pulls onto Clemmer behind the three vehicles.

**{¶ 10}** About a week after the shooting, during the course of his investigation, House compiled a list of Cadillac Eldorados in the area along with the addresses attached to the registrations for those vehicles. After finding approximately six vehicles of interest, House used Google Maps to plot his route to the locations of each vehicle. He noted

---

[2] Banks had described the Cadillac as a two-door with a sunroof.

that one of the Cadillacs was registered to Richard Shoup. A Google Maps aerial view of Shoup's residence showed a Cadillac with a sunroof in front of the home. House made contact with Shoup who indicated that he no longer owned the vehicle which he had sold to Chon Automotive.

{¶ 11} House contacted the owner of Chon Automotive, Miguel Bernardino, who indicated that during the summer of 2013 he had purchased the Cadillac from Shoup with the intent to resell it. Shoup gave Bernardino the title to the vehicle, but Bernardino did not transfer it into his name. Three days after purchasing it, Bernardino sold the Cadillac to Scott. He gave the title, still in Shoup's name, to Scott. A few months later, on October 3, 2013 (three days after the shooting), Bernardino found the car, without the title, sitting in his business parking lot. House had the Cadillac towed to the Dayton Police Department's evidence garage.

{¶ 12} Based upon his conversation with Bernardino, House then drove to Salem Avenue to look for additional suspect vehicles. As he was driving south on Malvern Avenue from Salem, he observed an individual in a black Volkswagen Jetta pull out behind him from an alley. The Jetta followed House as he turned right onto Otterbein Avenue and then right onto Elsmere Avenue heading back toward Salem. House, who was driving slowly in order to check the vehicles on the street, pulled to the curb to permit the Jetta to pass. The Jetta pulled up and stopped next to House's unmarked car, and the driver, identified as Scott, looked directly at House before proceeding.

{¶ 13} House continued his search and pulled into the alley that runs behind houses on the 1800 block of Elsmere Avenue. This was the same alley that Scott had pulled out of a few moments before. In the rear of 1824 Elsmere, House noted a vehicle

covered with a gray tarp. After noting a damaged and flattened tire, House exited his vehicle and touched the area of the tarp where the back window should be. He noted that the back window was missing which he found "consistent with the window that was left at the [shooting] scene * * *." Tr. p. 386. House then lifted the tarp high enough to observe that the vehicle was a Pontiac G6. House then contacted other detectives to inform them of the vehicle. He then pulled out of the alley onto Elsmere at which time he noted the Jetta coming back down the street. The Jetta slowed down as it pulled alongside House's vehicle, then continued its course of travel. House then parked at the end of the alley in order to observe whether anyone approached the Pontiac. After a few minutes, House noted the Jetta approaching his vehicle until the vehicles were "facing nose to nose." Tr. p. 388. The Jetta again drove away. These contacts led House to believe the driver of the Jetta was involved with the Pontiac.

{¶ 14} At that point, Detective Kevin Phillips arrived on location. He and House parked their vehicles and proceeded on foot to the Pontiac. As they approached the Pontiac, Scott again drove toward them. The Detectives drew their weapons and ordered Scott to exit the vehicle. Scott complied, was placed in handcuffs, and was transported to the Detectives Section of the Dayton Police Department for questioning where he was subsequently placed under arrest.

{¶ 15} House remained at the scene and called for an evidence technician to take pictures of the Pontiac. At that time, Detective Ryan Halburnt made contact with individuals in Apartment 3 of 1824 Elsmere Avenue. He was informed that Scott resided in Apartment 4. House then obtained a search warrant for the apartment. During the subsequent search of the apartment, the detectives found an orange tee shirt, a black

camouflage Cincinnati Bengals cap, and a Bible which was found to contain the title for the Cadillac, still in Shoup's name. The shirt and cap were consistent with the garments observed on the gas station surveillance video.

{¶ 16} At the scene, an inventory search was conducted on the Jetta. House found two cellular telephones and a Certificate of Self-Insurance issued to Scott from Enterprise Rent-a-Car for the Jetta. When he called the number on the certificate, he determined that Scott had rented the Jetta from the Enterprise store located on North Main Street in Dayton. It was determined that, at 5:40 p.m. on the day of the shooting, Scott had rented a black Ford Escape from that rental store. According to the rental agreement, Scott was to return the Escape on October 2. However, Scott returned the Escape the day after renting it and replaced it with another vehicle.

{¶ 17} After pictures were taken of the Pontiac, it was transferred to the Dayton Police Department evidence processing facility where it was held until a search warrant could be obtained. A search warrant was also obtained for the Cadillac. The broken left rear taillight assembly of the Pontiac was removed and sent to the Miami Valley Regional Crime Laboratory where a forensic scientist was able to match it to the debris collected at the scene of the shooting. The Detectives found that a protectant-type substance had been sprayed over the interior of the Pontiac. There was so much of the substance that its residue could be felt. According to Detective Gregory Moyer, the use of the substance made it impossible to process the inside of the Pontiac for DNA or fingerprints. It was determined during the investigation that the Pontiac was registered to Scott.

{¶ 18} Within fifteen minutes of being booked into the Montgomery County Jail,

Scott made a telephone call to an acquaintance whom he told to find his Bible. During the call he made reference to a "title," and a "mechanic on the Strip." According to House, the "Strip" is "a very well-known term for Gettysburg Avenue which is the location of Chon Automotive. A short time later he made a second call and asked the acquaintance whether she had been able to get the Bible. Later that evening, Scott made a third telephone call instructing the acquaintance to "get the whip from up the way." According to House, "whip is a street term or a slang term for expensive or a fancy car." House interpreted the call as telling the acquaintance to check on the Cadillac.

{¶ 19} Scott was indicted on two counts of tampering with evidence (alter/destroy) in violation of R.C. 2921.12(A)(1) as related to the Cadillac and the Pontiac. Following a jury trial, he was convicted on both counts. A sentencing hearing was conducted on January 26, 2017. The trial court imposed a twenty-four month sentence for each count of tampering with evidence, and ordered the sentences to be served consecutively for an aggregate term of 48 months. The trial court further ordered that the sentences would run consecutively to a prison term imposed in September 2016 by the District Court for the U.S. Southern District of Ohio.

{¶ 20} Scott has filed a timely appeal.


## II. Sufficiency and Manifest Weight of the Evidence

{¶ 21} Scott's first and third assignments of error are as follows:

THE STATE FAILED TO PROVE THAT MR. SCOTT COMMITTED

AN OVERT ACT AND/OR THAT HE ENGAGED IN ANY SUCH CONDUCT

WITH KNOWLEDGE THAT AN INVESTIGATION WAS FORTHCOMING.

THE GUILTY VERDICT ON BOTH COUNTS WAS NOT SUPPORTED BY SUFFICIENT, CREDIBLE EVIDENCE AND WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 22} Scott contends that the convictions must be reversed because the State failed to prove any of the elements of the offense of tampering with evidence.

{¶ 23} When a criminal defendant challenges the sufficiency of the evidence, he or she disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).  "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citation omitted.)  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), at paragraph two of the syllabus.

{¶ 24} In contrast, when a defendant contests the weight of the evidence, the argument "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. "Here the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 25} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11; *accord State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 17. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 26} "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 27} Scott was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1) which provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter,

destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." As the Supreme Court of Ohio stated, "[t]here are three elements of this offense: (1) knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11.

{¶ 28} We turn first to the claim that the State failed to prove the element of knowledge that an investigation is likely to be instituted. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Commonly, there is no direct evidence of a defendant's state of mind so the state must rely on circumstantial evidence to satisfy this element of its case. A defendant's state of mind may be inferred from the totality of the surrounding circumstances." *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 43 (8th Dist.), quoting *In re Horton*, 4th Dist. Adams No. 04CA794, 2005-Ohio-3502, ¶ 23. In Ohio, it is well-established that "a defendant may be convicted solely on the basis of circumstantial evidence." *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). "Circumstantial evidence and direct evidence inherently possess the same probative value." *Jenks*, paragraph one of the syllabus. "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in

controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. * * *' " *Nicely*, at 150, 529 N.E.2d 1236, quoting Black's Law Dictionary (5 Ed. 1979) 221.

**{¶ 29}** The Tenth District Court of Appeals has ruled that a defendant's knowledge that he committed a criminal act may itself establish knowledge that an investigation is likely. In *State v. Schmidtz*, 10th Dist. Franklin No. 05AP-200, 2005-Ohio-6617, ¶ 17, the court explained: "Whether defendant had actual notice of an impending investigation is irrelevant. When an offender commits an unmistakable crime, the offender has constructive knowledge of an impending investigation of the crime committed." Additionally, in two other cases, the Tenth District affirmed tampering with evidence convictions, determining that the defendants "surely knew" that official investigations would likely commence after they had fired gunshots which, in both cases, resulted in death. *See State v. Cockroft*, 10th Dist. Franklin No. 04AP-608, 2005-Ohio-748, ¶ 11; *State v. Jones*, 10th Dist. Franklin No. 02AP-1390, 2003-Ohio-5994, ¶ 35.

**{¶ 30}** This court has stated that the holding in *Schmidtz* is too broad and should not be "taken so literally." *State v. Cavalier*, 2d Dist. Montgomery No. 24651, 2012-Ohio-1976, ¶ 51. We further stated that a court should be aware that while it is reasonable to conclude that a person involved in crimes like fatal shootings or gross sexual imposition would be aware that the offense would likely be investigated, a lesser crime such as "loitering to solicit, or even solicitation [is] a crime without anyone who was likely to complain[, and thus a defendant would have] no great reason to suppose that she would be the subject of an official investigation." *Id.*

**{¶ 31}** In this case, there is evidence in the record upon which the jury could rely

to find that Scott was present at Gentry's murder. The video surveillance, along with the clothing found in Scott's apartment, is sufficient to place Scott in one of the three vehicles, the Escape, that exited the gas station right in front of Gentry's car. Banks testified that the Cadillac pulled around the black SUV and that he observed a red light beam and heard gunshots. He also observed that the SUV was beside the Cadillac when he observed the red beam. Gentry's car then crashed into the rear of Scott's Pontiac after which it ran through a fence and into a home. All three of the vehicles in front of Gentry's car were connected to Scott. Scott had interactions with the occupants of the other two vehicles while at the gas station. The shooting occurred just minutes after the vehicles left the gas station.

{¶ 32} Further, there is evidence in the record upon which the jury could conclude that Scott altered, concealed or removed the Pontiac and the Cadillac. The Pontiac was removed from the scene, despite its obvious damage, and concealed under a tarp. Further, so much protectant had been used in the Pontiac that a residue could be felt. The protectant made it impossible to collect fingerprints or DNA evidence from the vehicle. A juror could conclude that an innocent bystander whose car is rear-ended by another vehicle would not leave the scene of such an accident, and that they would instead remain at the scene in order to make a claim against the person at fault. However, Scott did not stay on the scene nor report that his car had been involved in an accident. Instead, he hid the car under a tarp in an alleyway. Also, the Cadillac was returned to Chon Automotive months after Scott had purchased it. Scott's telephone calls from the jail indicate that he was aware the car had been returned and that he wanted his friend to retrieve the title from his home in order to avoid its discovery.

{¶ 33} Based upon this record we conclude that a reasonable juror could find that Scott knew an investigation of the shooting was likely, and concealed, removed and altered the vehicles with the purpose to impair their availability as evidence to the law enforcement investigation. We conclude that there is evidence sufficient to sustain the convictions, and we further conclude that the jury did not lose its way in convicting Scott.

{¶ 34} The first and third assignments of error are overruled.

### III. Evidentiary Rulings

{¶ 35} Scott's second assignment of error states the following:

THE TRIAL COURT ERRED BY PERMITTING THE STATE TO PRESENT IRRELEVANT EVIDENCE AND/OR INFLAMMATORY EVIDENCE THAT SHOULD HAVE BEEN EXCLUDED PURSUANT TO RULE 403 OF THE OHIO RULES OF EVIDENCE.

{¶ 36} Scott contends that the trial court erred by permitting Banks to testify about Gentry's murder, and by permitting the State to use its Exhibit 8 which is a photograph of the scene of the murder. He claims that both raised issues that were irrelevant to the charges of tampering with evidence and were highly prejudicial and inflammatory.

{¶ 37} This court, in *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833 (2d Dist.), stated:

Evid.R. 402 provides that "[a]ll relevant evidence is admissible * * * [and that] [e]vidence which is not relevant is not admissible." The term "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence." Evid. R. 401. * * *.

"Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid. R. 403(A). "This rule 'manifests a definite bias in favor of the admission of relevant evidence, as the dangers associated with the potentially inflammatory nature of the evidence must substantially outweigh its probative value before the court should reject its admission.' " *In re S.A.*, 2d Dist. Montgomery Nos. 25994, 26001, 2014-Ohio-3063, ¶ 35, quoting *State v. White*, 4th Dist. Scioto No. 03CA2926, 2004-Ohio-6005, ¶ 50. Thus, "[w]hen determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission." *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 20, citing *State v. Frazier*, 73 Ohio St.3d 323, 333, 652 N.E.2d 1000 (1995). (Other citation omitted.)

*Id.*, ¶ 85-86.

**{¶ 38}** In this case, as noted above, the State was required to prove that Scott acted with knowledge that an investigation was likely to occur. Thus, the State had to prove that an offense likely to trigger an investigation had occurred. We agree with the State that Banks' testimony was relevant to the jury's understanding of that underlying offense. While that offense was, unfortunately, a murder, its occurrence was essential

to the charges of tampering with evidence. Further, Exhibit 8 is a picture of the displaced rear window of the Pontiac located in the street where the underlying offense occurred. While there were bullet casings in the picture, its focus was on the window which was connected to the Pontiac owned by Scott. This evidence was relevant to establish that the windshield came from Scott's Pontiac with, of course, this vehicle being the focus of one of the tampering counts.

{¶ 39} "[A] trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). An abuse of discretion connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 40} We cannot say that the probative value of the evidence about which Scott complains is substantially outweighed by its relevance. Thus, we conclude that Scott has failed to establish that the trial court abused its discretion. Accordingly, the second assignment of error is overruled.

### IV. Trial Court's Sentence

{¶ 41} The fourth assignment of error asserted by Scott is as follows:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN SENTENCING MR. SCOTT TO FORTY-EIGHT CONSECUTIVE MONTHS.

{¶ 42} Scott contends that the trial court abused its discretion in sentencing

because the sentence is excessive and because the trial court ordered the sentences to be served consecutively.

{¶ 43} We first note that Scott's assertion that our court applies an abuse of discretion standard in reviewing sentences is incorrect. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231. Instead, felony sentences are reviewed in accordance with R.C. 2953.08(G)(2). *State v. McCoy*, 2d Dist. Clark No. 2016–CA–28, 2016–Ohio–7415, ¶ 6, citing *State v. Marcum*, 146 Ohio St.3d 516, 2016–Ohio–1002, 59 N.E.3d 1231, ¶ 10, 16. Under the plain language of R.C. 2953.08(G)(2), "an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Marcum* at ¶ 1. "This is a very deferential standard of review, as the question is not whether the trial court had clear and convincing evidence to support its findings, but rather, whether we clearly and convincingly find that the record fails to support the trial court's findings." *State v. Cochran*, 2d Dist. Clark No. 2016–CA–33, 2017–Ohio–217, ¶ 7.

{¶ 44} Next, with regard to the claim that the sentences are excessive, we note that a trial court may impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences. *State v. King*, 2013–Ohio–2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011–Ohio–3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006–Ohio–855, 846 N.E.2d 1, ¶ 38. Here, the

twenty-four month prison term imposed by the trial court for each count was within the authorized statutory range of 9 to 36 months. R.C. 2929.14(A)(3)(b). Further, the trial court stated at the sentencing hearing that it had considered the purposes and principles of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12. Tr. p. 543-544.

{¶ 45} The trial court found that the offense was more serious because Scott attempted to cover up evidence of a murder rather than a lesser crime such as possession of drugs or theft. The trial court further found no factors indicating that the offenses were less serious. The trial court found that the likelihood of recidivism was high and that there were no factors indicating that recidivism was less likely.

{¶ 46} The record supports a finding that Scott showed no remorse, that he was on post-release control when the offenses were committed, that he has a lengthy criminal history including juvenile and adult offenses, and that he has not responded favorably to sanctions. In short, Scott has failed to demonstrate that the sentences imposed for each count are contrary to law or that the record does not support the findings of the court.

{¶ 47} We next address Scott's contention that the record does not support the imposition of consecutive sentences. Pursuant to R.C. 2929.14(C)(4) , a trial court may impose consecutive sentences if it determines that: (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following three findings are satisfied.

(a) The offender committed one or more of the multiple offenses while the

offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)–(c).

**{¶ 48}** In this case, the trial court made all the necessary findings for imposing consecutive sentences under R.C. 2929.14(C)(4). Specifically, the court found that Scott has a lengthy criminal history with "a very disturbing pattern of committing crimes while you're on probation or on post-release control going back to when you were a juvenile." The court made the following findings with regard to Scott's criminal record:

March 5th 2002, as a juvenile, theft for which you were placed on probation; then February 10th, 2005, as a juvenile, carrying a concealed weapon, placed on probation and while you were on probation for that juvenile [offense], carrying a concealed weapon, you commit an assault, August 25, 2005, placed on probation. And then the following month, an unauthorized use of a vehicle, September 25, 2005, placed on probation.

You turned 18 years old on November 4, 2005. Two weeks later, November 22nd, 2005, you're arrested and charged with a felony CCW. And while the felony CCW charge is pending, in March 2006, you commit a breaking and entering and you commit [in a separate case] another CCW and * * * you are placed on intervention in lieu of conviction, May 4, 2006.

Later that year, December 1, 2006, there's a revocation filed. Why? Because five months after you were placed on ILC * * * you commit, on October 23rd, an aggravated burglary with a firearm. * * * A prison sentence [is imposed].

You're released from prison [on] October 14th, 2011, you're placed on five years post-release control supervision and while you were on post-release control supervision in 2013, you commit a weapons under disability; [and on] May the 27th 2014, [the judge] imposes a nine-month prison sentence.

And it's also while you're on that PCR for that aggravated burglary, you commit * * * the two counts of tampering with evidence in connection with this murder case that's the subject of this trial.

So you're released from prison December 10th, 2014 and you're again on post-release control supervision and you pick up the federal case * * * you're convicted of possession with intent to distribute a mixture or substance containing a detectable amount of heroin, Schedule I controlled substance, and possession of a firearm in furtherance of a drug trafficking crime for which you receive a 7 ½ year sentence.

So I should say lengthy record and very worrisome pattern of, even while you're on probation supervision, repeatedly committing crimes while you are even under supervision.

Tr. p. 541-543.

{¶ 49} We conclude that this record supports the trial court's findings with regard to the imposition of consecutive sentences.

{¶ 50} Finally, we note that Scott implies that the trial court's sentencing indicates an intent to punish him for failing to accept a plea agreement and for his involvement in the underlying murder. We disagree. The trial court specifically noted that neither the lack of a plea agreement nor his involvement in the murder had an effect on sentencing. We find nothing in the record to indicate to the contrary. Indeed, although the State sought the maximum prison term of 36 months on each count, the trial court imposed prison terms falling within the mid-range of the terms allowed by R.C. 2929.14(A)(3)(b).

{¶ 51} We conclude that the record supports the trial court's findings under relevant statutes. We further conclude that the sentence is not otherwise contrary to law. Finally, we find no merit in Scott's claim that the trial court improperly considered Scott's failure to accept a plea agreement and/or the underlying murder when imposing sentence.

{¶ 52} Accordingly, the fourth assignment of error is overruled.


## V. Conclusion

{¶ 53} All of Scott's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.


Copies mailed to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Kim Bui
Hon. Dennis J. Langer