[Cite as *State v. Keister*, 2022-Ohio-856.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29081 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-1973 |
| | : | |
| MICHAEL KEISTER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of March, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. No. 0067020 & CATHERINE H. BREAULT, Atty. Reg. No. 0098433, 130 West Second Street, Suite 2150, Dayton, Ohio 45402
        Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Michael Keister was convicted after a jury trial in the Montgomery County Court of Common Pleas of aggravated possession of drugs (equal to or greater than five times the bulk amount, but less than 50 times the bulk amount), tampering with evidence, having weapons while under disability, and illegal conveyance of drugs of abuse onto the grounds of a detention facility. The court imposed concurrent sentences totaling a mandatory minimum term of 8 years to a maximum term of 12 years in prison.

{¶ 2} Keister appeals from his convictions, claiming that (1) the trial court erred in denying his motion to suppress, (2) his convictions were based on insufficient evidence and against the manifest weight of the evidence, (3) he was denied his right to a fair trial due to lack of access to his attorney and lack of assistance in building his defense, and (4) his sentence is not supported by the record. For the following reasons, the trial court's judgment will be affirmed.

### I. Facts and Procedural History

{¶ 3} At approximately 9:00 p.m. on June 15, 2019, Keister was involved in a single-car crash while he was driving on eastbound U.S. 35 in Dayton. An off-duty Dayton police officer witnessed the crash and stopped to see if Keister needed assistance. While there, the officer observed Keister place items, including what appeared to be a firearm wrapped in a sweatshirt, in an Amazon box and then take the box toward a fence line near the highway. The officer relayed his observations to uniformed officers who responded to the crash, as well as to Officer Denlinger, another officer whom the off-duty officer had contacted directly. While Keister was being detained by uniformed officers for purposes of the crash investigation, Officer Denlinger

located the box, which contained a firearm and Keister's state identification card, among other things. At Denlinger's instruction, Keister was arrested.

{¶ 4} Keister was transported to the Montgomery County Jail. During a search of Keister's person as part of the booking process, a corrections officer located a baggie of suspected methamphetamine in Keister's buttocks.

{¶ 5} On August 1, 2019, Keister was indicted on aggravated possession of drugs (methamphetamine), a second-degree felony; having weapons while under disability, a third-degree felony; illegal conveyance of drugs of abuse onto the grounds of a detention facility, a third-degree felony; tampering with evidence, a third-degree felony; and carrying a concealed weapon, a fourth-degree felony.

{¶ 6} Keister moved to suppress the evidence against him. He asserted that he was unlawfully detained in a police cruiser without reasonable suspicion, that the detention was unlawfully prolonged, that the search at the jail stemmed from an unlawful arrest, and that statements he made were involuntary or obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After a hearing, the trial court denied the motion in its entirety.

{¶ 7} Prior to trial, the State indicated that it was dismissing the charge of carrying a concealed weapon, and the remaining counts proceeded to a jury trial. After deliberations, the jury found Keister guilty of all charges. The trial court sentenced Keister to a mandatory minimum term of 8 years and a maximum term of 12 years in prison for aggravated possession of drugs, three years for heaving weapons while under disability, three years for illegal conveyance, and three years for tampering with evidence. All counts were to be served concurrently.

{¶ 8} Keister appeals from his convictions.

## II. Motion to Suppress

{¶ 9} In his first assignment of error, Keister claims that the trial court erred in denying his motion to suppress.

{¶ 10} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

### A. Facts from Suppression Hearing

{¶ 11} The State's evidence at the suppression hearing consisted of the testimony of three Dayton police officers: Jack Miniard, David Denlinger, and Paul Gottlieb. Keister did not offer any witnesses on his own behalf. The State's evidence established the following facts.

{¶ 12} At approximately 9:00 p.m. on June 15, 2019, Officer Miniard was traveling eastbound on U.S. 35, approaching the Steve Whalen Boulevard exit, when he observed a 1980s white Oldsmobile "veer off the roadway to make the exit," lose control, spin around, hit a light/utility pole, and come to rest in a ditch on the right side of the roadway near the fence line of Boltin Street. Miniard saw the driver put the car in reverse, but the

tires spun and the vehicle was unable to back up.

{¶ 13} When the crash occurred, Miniard, an officer with more than 20 years of experience with the Dayton police, was off-duty and traveling in his personal vehicle with his family. Miniard pulled over to the side of the road and called 911. Upon learning that crews from the East Division were "tied up" and responding officers were coming from a distance away, Miniard called Officer Denlinger, his former partner, and asked if he was available. Officer Denlinger responded that he was nearby in the Oregon District and was able to respond.

{¶ 14} While still seated in his own vehicle, Officer Miniard saw a passenger exit the Oldsmobile and put his backpack in the vehicle's trunk. Miniard then observed the driver, later identified as Keister, go to the rear of the car and move items around. Miniard got out of his vehicle, approached Keister without identifying himself, and asked if Keister needed assistance from the police, a medic, or a tow truck. Keister responded that he was fine and had called AAA, which would be there in approximately 45 minutes.

{¶ 15} Miniard noticed that Keister was putting multiple items in a large brown Amazon box, including the passenger's backpack, a Folgers container, and a dark blue sweatshirt that appeared to have an item hidden in it. Based on the way Keister grabbed the sweatshirt and the shape of it, Miniard assumed the hidden object was a gun. As Miniard walked back to his car, he saw Keister take the Amazon box to the fence line in the area of Boltin and Hulbert Streets (about 25 yards away) and then return to the car. Keister again was walking away from the car as uniformed officers, Officers Gotlieb and Hudson, arrived. Miniard informed the officers where Keister was headed and indicated that he would return to the scene after taking his family home. At that point, Miniard had

been at the scene for 10 to 15 minutes.

{¶ 16} As Miniard was leaving the scene, he saw the uniformed officers talking with the passenger, Jesse Ladd, who had remained by the Oldsmobile the entire time. He also observed Keister walking back toward his vehicle. Miniard noticed that Keister's clothing had changed: he no longer was wearing a black do-rag or a red jersey with the number 3 on it and, instead, he was wearing an off-white tank top. Miniard also talked with Officer Denlinger and gave him the location of where he had seen Keister place the Amazon box.

{¶ 17} While Officer Gotlieb was speaking with Ladd, Keister approached them from the other side of the fence, asked if everything was okay, and indicated that he knew Ladd. Keister did not immediately identify himself or indicate that he had been involved in the crash. Ladd whispered to the officers that the man was the driver of the vehicle. Officer Gotlieb asked Keister to come to the other side of the fence and sit in his cruiser. Keister willingly complied. Gotlieb conducted a pat down for weapons, and after removing Keister's knife, placed him without handcuffs in his cruiser. Officer Gotlieb testified that he was going to investigate the crash and issue citations, likely for failure to control and possibly for hit and run.

{¶ 18} The cruiser video reflects that the officers continued speaking with Ladd. After a few minutes, Gotlieb asked Keister if he knew who owned the car; Keister responded that he did not.

{¶ 19} Upon his arrival, Officer Denlinger checked on the status of the uniformed officers and then drove into the neighborhood where Officer Miniard had indicated that Keister had taken the box. Denlinger located the box and took it to his cruiser. Inside,

he found a handgun wrapped in a hoodie or towel and a blue backpack. The backpack contained a notebook/ledger, a needle, illegal narcotics, and Keister's wallet with his state identification card. Officer Denlinger notified the uniformed officers of what he had found and asked them to detain the two occupants of the vehicle.

{¶ 20} Approximately 13 minutes after Keister was placed in the cruiser, Officer Gotlieb placed him under arrest. A few minutes later, the officer notified Keister of his *Miranda* rights using a laminated card provided by the Montgomery County Prosecutor's Office. Gotlieb testified that Keister appeared to be somewhat intoxicated, but not to the point where he could not understand his rights. Keister agreed to speak with Gotlieb and made statements denying knowledge of the Amazon box, where the gun came from, who the driver was, and why his wallet with his identification was in the box.

{¶ 21} Officer Miniard returned after 10 to 15 minutes and parked on Boltin Street near Denlinger's cruiser. Officer Denlinger showed Officer Miniard the box, and Miniard confirmed that it was the box that he had seen being removed from the Oldsmobile. The gun was still wrapped in the sweatshirt, but Denlinger told Miniard that there was a gun inside.

{¶ 22} Upon his return, Miniard remained on the scene for more than 45 minutes, until he and another officer located Keister's jersey in a nearby alley. While he was there, he looked in the cruiser and confirmed that Keister was the driver he had seen.

{¶ 23} After being on-scene for roughly one hour, Officer Gotlieb transported Keister to the Montgomery County Jail. While Keister was in the prisoner intake room, a corrections officer found a bag of methamphetamine in Keister's buttocks.

**B. Length of Detention**

{¶ 24} On appeal, Keister does not claim that his initial detention itself was unlawful. Rather, he asserts that his detention was unlawfully prolonged to allow officers to locate the box that Officer Miniard had seen.

{¶ 25} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Whether a stop and/or search is reasonable under the Fourth Amendment depends upon the particular facts and circumstances, viewed objectively by examining the totality of the circumstances. *See State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 14.

{¶ 26} The law recognizes three types of police-citizen interactions: (1) a consensual encounter; (2) a brief investigatory stop or detention; and (3) an arrest. *State v. Weisgarber*, 2017-Ohio-8764, 88 N.E.3d 1037, ¶ 15 (2d Dist.), citing *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 20 (2d Dist.). In determining whether an individual engaged in a consensual encounter or was subject to an investigatory detention, the focus is on the police officer's conduct, not the subjective state of mind of the person stopped. *Id.* at ¶ 18; *State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 25.

{¶ 27} Consensual encounters are not seizures, and Fourth Amendment guarantees are not implicated in such encounters. *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60 (2d Dist.1995), citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consensual encounters occur when the

police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *Mendenhall* at 553. " 'Generally, when a police officer merely approaches and questions persons seated within parked vehicles, a consensual encounter occurs that does not constitute a seizure so as to require reasonable suspicion supported by specific and articulable facts.' " *State v. Mayberry*, 2d Dist. Montgomery No. 23736, 2010-Ohio-4150, ¶ 25, quoting *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, 936 N.E.2d 529, ¶ 20 (10th Dist.).

{¶ 28} As to investigatory detentions, police officers may briefly stop and/or temporarily detain individuals to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a minor traffic violation. *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. Probable cause is not required for a *Terry* stop. *Id.*; *State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, 175 N.E.3d 527; *Kansas v. Glover*, __ U.S. __, 140 S.Ct. 1183, 1187, 206 L.Ed.2d 412 (2020); *State v. Allen*, 2d Dist. Montgomery No. 28874, 2021-Ohio-3047, ¶ 32.

{¶ 29} The duration of a *Terry* stop is determined by the purpose for which it was initiated, and the detention may not last longer than is necessary to accomplish that purpose. *See Rodriguez v. United States*, 575 U.S. 348, 354, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015) (addressing whether officers unlawfully prolonged a traffic stop); *State v. Cook*, 65 Ohio St.3d 516, 521, 605 N.E.2d 70 (1992) ("An investigatory *Terry* stop is a limited infringement on personal freedom, and is proper when based on articulable facts constituting reasonable suspicion and the subsequent investigation is pursued diligently

in a manner likely to confirm or dispel suspicion quickly."). The reasonableness of the detention "depends on what the police in fact do," and the officer's diligence is measured "by noting what the officer actually did and how he did it." *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276, ¶ 13 (2d Dist.), quoting *Rodriguez* at 357. An officer may not prolong a *Terry* stop even if the overall duration of the stop remains reasonable compared to the duration of other stops involving similar circumstances. *Id*.

{¶ 30} Officer Miniard's initial interaction with Keister was a consensual encounter. Miniard was off-duty when the crash occurred, was in a private vehicle with his family, never identified himself as a police officer, and merely asked if Keister required assistance. Nothing in Miniard's appearance or behavior suggested that Keister was subject to an investigatory detention.

{¶ 31} Keister's initial contact with Officer Gotlieb also was a consensual encounter. Keister approached Officer Gotlieb while he and his partner were speaking with Ladd, the passenger. Ladd whispered to the officers that Keister was the driver of the vehicle that crashed. Gotlieb then asked Keister to come to the other side of the fence and have a seat in this cruiser. Gotlieb testified that Keister willingly agreed to do so. According to the cruiser video, Keister was placed in the cruiser at 9:23 p.m.

{¶ 32} Keister asserts that he was subject to an investigatory detention when he was placed in the cruiser and that this detention was unlawfully prolonged to allow Officer Denlinger to find the Amazon box. Assuming that Keister was detained when he was placed in the cruiser (as opposed to willingly sitting there as part of the consensual encounter), the officers had reasonable and articulable suspicion of criminal activity to detain him. Officers Gotlieb and Hudson had responded to a crash and found a car that

had collided with a utility pole. Keister had left the scene and, upon his return, was identified by the passenger as the driver of the vehicle. Further, Officer Gotlieb noticed that Keister showed signs of impairment. The officers were justified in detaining Keister to investigate the circumstances of the crash. That reasonable investigation included ascertaining Keister's and Ladd's identities and verifying that information, determining what occurred and the extent of the damage caused, and issuing citations.

{¶ 33} Moreover, Keister's detention was justified to investigate the location and contents of the Amazon box. Only 13 minutes elapsed between when Keister was placed in the cruiser and his arrest, and the cruiser video shows that the officers were diligently investigating the crash involving Keister and Ladd during that time. And, the investigation of the location of the Amazon box was also ongoing during this 13-minute period.

{¶ 34} Keister's first assignment of error is overruled.

### III. Sufficiency and Manifest Weight of the Evidence

{¶ 35} In his second assignment of error, Keister claims that his convictions for having weapons while under disability, tampering with evidence, and illegal conveyance were based on insufficient evidence and against the manifest weight of the evidence. He does not challenge his conviction for aggravated possession of drugs as against the manifest weight of the evidence.

{¶ 36} The State presented six witnesses at trial. The testimony of Officers Miniard, Denlinger, and Gottlieb generally was consistent with their testimony at the suppression hearing. Gage Lesher, a corrections officer with the Montgomery County Sheriff's Office, testified about the intake procedures for Keister at the Montgomery

County Jail on June 15, 2019. Jennifer Watson, a forensic chemist and chemistry technical leader at the Miami Valley Regional Crime Lab (MVRCL), testified that she analyzed a substance submitted by the Dayton Police Department and found it to be 23.56 grams, plus or minus 0.02 grams, of a substance containing methamphetamine, a Schedule II controlled substance. Watson further indicated that the bulk amount of methamphetamine is 3 grams. Finally, Aaron Davies, a firearm examiner at MVRCL, testified that he tested the firearm located on June 15, 2019 – a Hi-Point Model JHP .45 auto caliber pistol – and found it to be operable. The parties stipulated that Keister had a prior conviction for possession of heroin in Montgomery C.P. No. 2015-CR-3032, which was a felony offense involving illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

{¶ 37} Keiser did not present any witnesses or exhibits on his own behalf.

**A. Standards of Review**

{¶ 38} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. Moreover, reasonable inferences that may be drawn from the evidence must be viewed in the same most favorable light. *State v. Deckard*, 2017-Ohio-8469, 100 N.E.3d 53 (11th Dist.), ¶ 29, citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State*

*v. Jenks*, 61 Ohio St.3d 259, 273, 574 M.E.2d 492 (1991).

{¶ 39} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.   When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact.   Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 40} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses.   *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).   The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14.   A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.   *Martin* at 175.

{¶ 41} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."   *Thompkins* at 386. However, where an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient

evidence.   *State v. McLoughlin*, 2d Dist. Champaign No. 2017-CA-22, 2018-Ohio-2426, ¶ 8; *State v. Million*, 2d Dist. Montgomery No. 24744, 2012-Ohio-1774, ¶ 23.

### B. Having Weapons While Under Disability

**{¶ 42}** Keister claims that the State's evidence was insufficient to prove that he possessed the gun located inside the Amazon box.   He emphasizes that no one observed him with a gun, and he argues that the State's evidence did not support a conclusion that he constructively possessed the gun.

**{¶ 43}** R.C. 2923.13 states in pertinent part: "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance * * *."   To "have" a firearm for purposes of R.C. 2923.13, a person must actually or constructively possess it.   *State v. Bursey*, 2d Dist. Montgomery No. 28976, 2021-Ohio-2857, ¶ 49, citing *State v. Fleming*, 2d Dist. Clark No. 2014-CA-136, 2015-Ohio-5382, ¶ 26.

**{¶ 44}** " 'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).   A person has constructive possession of an object when he or she is conscious of the presence of the object and able to exercise dominion and control over it, even if it is not within his or her immediate physical possession.   *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus; *Bursey* at ¶ 50.   "Establishment of ownership is not required."   *State v. Rastbichler*, 2d Dist. Montgomery No. 25753, 2014-Ohio-628, ¶ 33.

**{¶ 45}** In determining whether an individual possessed an item, courts consider all

of the facts and circumstances surrounding the incident. *Bursey* at ¶ 50, citing *State v. Mabry*, 2d Dist. Montgomery No. 21569, 2007-Ohio-1895, ¶ 20. Circumstantial evidence and direct evidence have the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

**{¶ 46}** In this case, substantial circumstantial evidence supported a conclusion that Keister possessed the Hi-Point firearm. Officer Miniard testified at trial that he had observed Keister place numerous items, including a blue hoodie with what Miniard believed to be a gun, into an Amazon box following the crash. Miniard stated that Keister "was carefully holding the hoodie and the shape that he was holding it in, was holding it crossways meaning that the barrel, the handle, would be at an angle going out this way, carefully placing it in the back." Tr. 161. Miniard did not see Ladd, the passenger, place any items in the box.

**{¶ 47}** Miniard testified that he then saw Keister take the box and proceed "eastbound in the grass paralleling Boltin Street and the fence line." The officer lost sight of Keister when he went into the tree line, but saw Keister return "moments later" without the box. Officer Miniard told Officer Denlinger the approximate location of where Keister had gone. Officer Miniard left the scene to take his family home, returned 10 to 15 minutes later, and went to the vicinity of Boltin and Hulbert Streets. Officer Denlinger had already located a box containing the same items that Miniard had reported. Keister's wallet with his identification and a gun were among the items located inside the box. Officer Gottlieb testified that, after Keister's vehicle was towed, he went to Denlinger's location and looked at the items. Gottlieb described the firearm as a Hi-Point .45 caliber handgun; a .45 caliber magazine with nine bullets also was recovered. Subsequent

testing by Aaron Davies, a firearm expert, established that the gun was operable.

{¶ 48} Prior to leaving the scene, officers searched the nearby area. A red football jersey with the number 3 was found behind a garage on Hulbert Street; Miniard had seen Keister wearing that jersey immediately after the crash. In addition, Officer Miniard testified that he looked at Keister while Keister was seated in the cruiser and confirmed that Keister was the driver he had seen.

{¶ 49} Based on the totality of the evidence, Keister's conviction for having weapons while under disability was based on sufficient evidence and was not against the manifest weight of the evidence. The jury could have reasonably concluded that Keister was the individual who had driven the Oldsmobile, that he had placed a wrapped firearm into an Amazon box, and based on Keister's handling of that wrapped weapon, that he knowingly had possessed the gun while it was in the car. Moreover, the evidence supported a reasonable conclusion that Keister had taken the firearm and other items in the Amazon box to a location near the fence line and that the firearm located by Officer Denlinger a short time later, an operable Hi-Point .45 caliber handgun, was the gun that Keister had possessed.

{¶ 50} Keister emphasizes that no one saw him with a firearm, that Officer Miniard merely assumed that a gun was wrapped inside the sweatshirt, and that Miniard did not have Keister in his line of sight at all times. Direct evidence of possession, however, was not required, and the State's circumstantial evidence amply supported the conclusion that a firearm was, in fact, wrapped in the sweatshirt, that Keister possessed and hid it, and that it was found shortly thereafter by Officer Denlinger. Moreover, although Officer Gottlieb testified that Keister claimed that he was not the driver of the Oldsmobile and

denied knowledge about the Amazon box, the jury was free to believe that those statements by Keister were untruthful. The jury did not lose its way in finding Keister guilty of having weapons while under disability.

{¶ 51} Keister's second assignment of error is overruled as it pertains to having weapons while under disability.

### C. Tampering with Evidence

{¶ 52} Keister next contends that his conviction for tampering with evidence was based on insufficient evidence and against the manifest weight of the evidence. His argument is two-fold: (1) he could not have tampered with the firearm because he did not possess it, and (2) because he did not know that Officer Miniard was a police officer, he had no way of knowing that there was an official proceeding or investigation occurring.

{¶ 53} Keister was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which states: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" As the Supreme Court of Ohio stated, "[t]here are three elements of this offense: (1) knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11.

{¶ 54} Keister's first argument in unavailing. The State presented substantial

circumstantial evidence to support a conclusion that Keister knowingly possessed the firearm and other items that he placed in the Amazon box.

{¶ 55} Keister secondly argues that the State's evidence does not support a conclusion that when he hid the handgun and drug paraphernalia, he knew that an investigation regarding these items was likely, and that he hid the items to impede their availability in such an investigation.   We disagree.

{¶ 56} *Straley* is the leading case concerning whether the State has presented sufficient evidence to sustain a tampering with evidence conviction.   In *Straley*, two plainclothes narcotics detectives in an unmarked police vehicle observed a vehicle being driven erratically and conducted a traffic stop for public safety reasons.   Upon approaching the driver, Detective Speakman noted the smell of an alcoholic beverage and asked the driver, Straley, to exit the vehicle.   Straley could not produce her driver's license and had slurred speech.   With her consent, the detectives searched the vehicle but found no contraband.   They decided not to pursue charges against Straley but would not allow her to drive home.   As the detectives were arranging transportation for her, she indicated that she needed to use the restroom and went 20 to 30 feet away from Detective Speakman, where she urinated.   Straley then returned to the detective.   Speakman walked back to the area where she had urinated and located a baggie with what appeared to be crack cocaine.   Straley was charged with trafficking in drugs, possession of cocaine, and tampering with evidence.

{¶ 57} On appeal to this appellate court, we reversed the conviction for tampering with evidence, concluding that there was nothing in the record to support a finding that Straley had acted with purpose to impair the value of evidence of any ongoing

investigation, i.e., driving under the influence or driving without a license, or any likely investigation, i.e. public urination. *State v. Straley*, 2d Dist. Clark No. 2012-CA-34, 2013-Ohio-510. The State appealed, arguing that "an investigation involves the process of gathering facts and information and may grow beyond the scope of initial charges," and therefore, "if law enforcement investigates a suspect for possible criminal conduct, that investigation necessarily encompasses all criminal conduct that law enforcement may discover." *Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, at ¶ 12.

{¶ 58} In affirming our judgment, the Ohio Supreme Court emphasized the statute's language that the action must be taken "with purpose to impair its value or availability *as evidence in such proceeding or investigation*." (Emphasis added.) The court noted:

> In this instance, "such" investigation refers back to the investigation just specified, i.e., the one that that the defendant knows is ongoing or is likely to be instituted. Therefore, the evidence must relate to that investigation; otherwise, the word "such" loses all meaning. The state's argument that all evidence recovered in an investigation should be included in the ambit of the tampering statute would require us to change the language from "such" proceeding or investigation to "any" proceeding or investigation.

*Id.* at ¶ 16. The supreme court held that "a conviction for tampering with evidence pursuant to R.C. 2921.12(A)(1) requires proof that the defendant intended to impair the value or availability of evidence that related to an existing or likely official investigation or proceeding." *Id.* at ¶ 19. "Likelihood is measured at the time of the act of alleged tampering," and the supreme court concluded that there was nothing in the record to

suggest that the officers were conducting or likely to conduct an investigation into trafficking or possession of cocaine when Straley discarded the baggie. *Id.*

**{¶ 59}** Turning, then, to the pending case, consistent with *State v. Straley* and with the sufficiency of the evidence standard in mind, we conclude that a juror could have reasonably inferred that Keister knew,[1] based upon the disabled status of his vehicle, that his vehicle would be towed and that, before the tow occurred, the vehicle would be searched. From this, a juror could have rationally concluded that Keister realized that such a search would reveal the handgun and drug paraphernalia and trigger an investigation of these items. Finally, a juror could have reasonably concluded that Keister removed and hid the handgun and drug paraphernalia with the purpose to prevent such an investigation. Moreover, a juror could have rationally concluded that, when Keister placed his state identification card into the Amazon box, he knew that an investigation of the wrecked, disabled vehicle was inevitable, that the identification card could connect him to the vehicle, and that he placed the card into the box with the purpose to prevent this connection and, thus, to impair the investigation into the single-vehicle collision. Thus, the State presented sufficient evidence on each element to support a tampering with evidence conviction.

**{¶ 60}** This conclusion is also consistent with our decision in *State v. Wilcox*, 2d Dist. Clark No. 2013-CA-94, 2014-Ohio-4954. In that case, at a traffic stop, police

---

[1] R.C. 2901.22(B) defines knowingly as follows: "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

officers observed Wilcox, a front seat passenger, lean down and toward the driver's seat. The officers immediately suspected that Wilcox had placed something under the driver's seat. Ultimately, the vehicle was searched and a handgun was found under the driver's seat. Wilcox, among other charges, was indicted and convicted of tampering with evidence based upon his placement of the handgun under the driver's seat. In reliance upon *Straley*, we concluded that the conviction was not supported by sufficient evidence; we stated that the record "suggests, at best, that an investigation regarding Wilcox's possession of a weapon was initiated a split second before he actually placed the handgun under the driver's seat." *Id.* at ¶ 26. We then concluded that there was no evidence that, when Wilcox hid the handgun, he knew that an investigation of the handgun was ongoing or likely. *Id.* Thus, we concluded that a reasonable juror could not have found that Wilcox's purpose in putting the handgun under the seat was "to impair its availability in the [officers'] investigation." *Id.* In contrast, Keister had the opportunity to consider the probable result of his circumstances. And, as discussed, a juror could have rationally inferred, after such consideration, that Keister knew that his vehicle would probably be searched, the items found, and an investigation initiated. Therefore, a juror could have reasonably concluded that Keister hid the items to prevent the probable investigation of the handgun and drugs.

{¶ 61} Based upon the evidence as outlined, we further conclude that the tampering with evidence conviction was not against the manifest weight of the evidence. Thus, Keister's second assignment of error is overruled as it relates to the tampering with evidence conviction.

### D. Illegal Conveyance

{¶ 62} Keister further claims that his conviction for illegal conveyance, in violation of R.C. 2921.36(A)(2), was based on insufficient evidence and against the manifest weight of the evidence. He argues that he was not adequately warned, either orally or in writing, against conveying drugs of abuse into the Montgomery County Jail.

{¶ 63} During his testimony, Officer Gottlieb described the booking process for the Montgomery County Jail. He stated that, upon taking an arrestee out his cruiser, he walks the person into the intake room of the jail. At that point, a deputy takes the arrestee into a separate room where the individual is searched prior to being booked into the jail. Gottlieb stated that officers are able to observe the search through a window, and if any evidence is found, the corrections officer provides that evidence to the officer so that it can be tagged as evidence and additional charges brought. As for Keister specifically, Gottlieb stated that he (Gottlieb) was in the booking room when a large amount of methamphetamine was recovered from Keister's buttocks; Gottlieb did not see the drugs pulled from Keister's buttocks. The corrections officer immediately gave Gottlieb the drugs as evidence.

{¶ 64} Gottlieb further testified that there are several signs at the jail informing individuals that bringing contraband (such as drugs and weapons) into the jail is a felony offense. Gottlieb stated that signs are located in the sally port area where officers park their cruisers and where prisoners sit until they are taken into the room to be searched. Gottlieb did not recall pointing out a sign to Keister or reading it to him.

{¶ 65} Corrections Officer Lesher testified that he was working as an Intake Utility Officer on June 15, 2019. That position involved searching inmates that enter the facility, running them through a body scanner, and then dressing them in jail-issued uniforms.

When Keister was brought in, Lesher told Keister to face a mat on the wall and then conducted a clothed pat-down search before running him through a body scanner. During the pat down search, Lesher felt an object in Keister's pants. When asked what the object was, Keister responded that he had defecated. Based on the object's hardness, Lesher did not believe that response, and he called for a sergeant to come in. Lesher then pulled Keister's waistband back and saw in Keister's buttocks a clear baggie with a white crystal substance that the officer believed to be methamphetamine. Lesher asked Keister what it was, and Keister replied that he did not know. Lesher placed the baggie in an envelope and gave it to Officer Gottlieb. The MVRCL later determined that the substance contained methamphetamine.

{¶ 66} Lesher also testified that there are warning signs about bringing items into the jail. He stated that there are two signs in the outer receiving area when entering the facility – one sign facing the mats and another sign before entering the secondary receiving room where searches are conducted. The State offered photographs of two signs reading "Body Scanner Now in Use!! Contraband found beyond this point can/will result in additional charges for O.R.C. 2921.36 – illegal conveyance into a detention facility." (Capitalization omitted.) (State's Ex. 5, 6.) Lesher did not draw Keister's attention to the signs. Lesher further testified, however, that before conducting the pat-down, he asks arrestees if "they have anything on them that can stick, stab or hurt me or any other contraband or weapons on their person." Lesher stated that he does this every time and that he asked Keister that question.

{¶ 67} R.C. 2921.36(A)(2), the illegal conveyance statute, provides that "[n]o person shall knowingly convey, or attempt to convey, onto the grounds of a detention

facility * * * any of the following items: * * * (2) Any drug of abuse, as defined in section 3719.011 of the Revised Code[.]" The State's evidence established that Keister hid a baggie containing methamphetamine in his buttocks, brought it into the Montgomery County Jail, and lied to a corrections officer when asked what it was. That evidence was sufficient to prove that Keister violated R.C. 2921.36(A)(2).

{¶ 68} Nothing in the statute requires law enforcement officers to provide Keister warnings of the consequences of bringing drugs into the jail. *State v. Cole*, 8th Dist. Cuyahoga No. 91305, 2010-Ohio-6639, ¶ 9. Regardless, several signs were posted at the receiving area of the jail, warning arrestees that bringing contraband into the jail could result in charges under R.C. 2921.36. In addition, Officer Lesher specifically asked Keister, prior to conducting the pat-down, if Keister had any contraband, weapons, or things that could hurt him. Accordingly, Keister's argument lacks merit.

{¶ 69} Keister's second assignment of error is overruled as it relates to illegal conveyance.

### IV. Assistance of Counsel

{¶ 70} Keister's third assignment of error claims that he was "denied his right to [a] fair trial by not having access to his counsel or the assistance of his counsel in building his defense." Keister appears to assert that, due to lack of communication with his attorney, he was denied the effective assistance of counsel.

{¶ 71} To establish an ineffective assistance of counsel claim, a defendant must satisfy the two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). The defendant must demonstrate that (1) defense counsel's performance

fell below an objective standard of reasonableness, and (2) the defendant was prejudiced by counsel's errors. *Id.* A failure to meet either prong defeats the claim.

**{¶ 72}** At to the first prong, much deference is given to trial counsel. *State v. Henderson*, 2d Dist. Montgomery No. 28975, 2021-Ohio-3943, ¶ 37. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State v. Bird*, 81 Ohio St.3d 582, 585, 692 N.E. 2d 1013 (1998). For counsel's performance to be deficient, counsel's performance must be so poor that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 24; *Henderson* at ¶ 39. To demonstrate prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Henderson* at ¶ 38, quoting *Bradley* at paragraph one of the syllabus.

**{¶ 73}** "A trial attorney's failure to communicate with his or her client may rise to the level of deficient performance, depending on the circumstances." *State v. Lawson*, 2020-Ohio-6852, 164 N.E.3d 1130, ¶ 106 (2d Dist.). However, such a claim generally is not cognizable on direct appeal. As we have previously said, "a claim of lack of communication between a defendant and his trial counsel is not one that can be borne out by the record. It relies upon information necessarily outside the record, and is therefore not an issue we can review on direct appeal." *State v. Watters*, 2016-Ohio-8083, 76 N.E.3d 723, ¶ 27 (2d Dist.).

**{¶ 74}** According to the record, Keister twice expressed frustration with difficulty in communicating with his attorney. During a pretrial conference on April 16, 2020, the trial

court informed the parties that it was postponing the trial date. Defense counsel told the court that Keister had said "as recently as, I believe, last week that he wished to keep this trial date and move forward." After the trial court stated that it understood but a new trial date had been selected, Keister asked:

> THE DEFENDANT: – would you take into consideration for me to be able to be placed back on EHDP so I can be preparing myself for trial? Because in here I have no contact with my attorney as I should be able to. It's almost impossible for me to develop some kind of rapport with him and at least some kind of, you know, decent form of, you know, rebuttal for trial.

Tr. 76. Defense counsel responded that he had visited with Keister "a couple times in the last couple weeks. In addition, I have dropped off legal paperwork at the property room." Tr. 76. When the trial court said that it would encourage defense counsel to continue to meet with him, Keister clarified: "What I was saying that it's hard for me to be able to reach out to him. It's not him not responding to me." Tr. 77. The trial court then responded:

> THE COURT: Gotcha. And I understand that. And that's what happens if you're waiting for trial while in custody. There's nothing I can do about what's in the jail as far as communication but I can always make sure that your attorney is visiting you in order to prepare, so. We'll move forward and you can meet with Mr. Keister at your earliest convenience.

Tr. 77.

{¶ 75} In his appellate brief, Keister highlights the following exchange between defense counsel and the trial court, which occurred following the completion of the

questioning of potential jurors on the first day of trial (June 29, 2020):

[DEFENSE COUNSEL]: Mr. Keister has brought a couple concerns to my attention. I don't know if the Court would entertain to address them quickly before moving on or not.

THE COURT: Okay. Go ahead.

[DEFENSE COUNSEL]: He believes he has been denied contacting me, his family, as well as getting law library at reasonable times. He has mentioned that he has hasn't received medical treatment for his eye. I think those are the big issues.

I'm prepared for trial but it seems my understanding, if I'm reading all that correctly, that Mr. Keister may not feel as if he's prepared.

THE COURT: Okay. Well, we've been having this matter set for a long time. [Defense counsel] has, from my understanding, is more than capable, has been prepared to address and handle this case. He's the one that is going to try this case. I will make sure, though, that [defense counsel] stays in constant communication throughout this trial as we move forward.

When we take a break and we come back tomorrow, I'm sure that – I will make sure that the deputies address any issues with his health. If you are having issues with your health, let us know so we can take a break to address that issues but we're going to move forward with this trial today. And then we are going to select the jury today, proceed to – after we select the jury, we will take a break and that will give you-all some time to discuss,

give some time for him to attend whatever he needs to attend to.   Okay?

[DEFENSE COUNSEL]:   Thank you, sir.

Tr. 128-129.

{¶ 76} The record thus reflects that Keister had continuing concerns regarding his ability to reach out to defense counsel for trial preparation, which were relayed to the trial court.   However, the content and extent of Keister's communications with his attorney are not detailed in the record, and there is nothing in the record to support Keister's contention that his communications with defense counsel were inadequate to enable him to assist with his defense.   The record further reflects that defense counsel made efforts to communicate with Keister, and in April 2020, Keister expressly stated that he had no complaints with his attorney's responsiveness.   In the discussion on the first day of trial, the trial court told Keister and defense counsel that they would have time to converse after jury selection was completed, and there is nothing to suggest that Keister's concerns were not allayed.   Keister does not identify any deficient performance by defense counsel at trial or articulate how he was prejudiced by the extent of the communications. On this record, Keister has not demonstrated that his attorney acted deficiently or that he was prejudiced by his attorney's conduct prior to or during trial.   To the extent that Keister's claim regarding lack of communication relies on evidence outside the record, the claim is more properly raised in a petition for post-conviction relief.

{¶ 77} Keister's third assignment of error is overruled.

### V. Keister's Sentence

{¶ 78} In his fourth assignment of error, Keister claims that the record "does not clearly and convincingly support" his sentence.   Keister focuses on his sentence for

aggravated possession of drugs, for which he received a maximum term. Pursuant to the Reagan Tokes Act, that sentence consisted of a mandatory indefinite term of a minimum of 8 years and a maximum of 12 years in prison.

{¶ 79} When reviewing felony sentences, we must apply the standard of review set forth in R.C. 2953.08(G). Under that statute, an appellate court may increase, reduce, or modify a sentence, or vacate it all together and remand for resentencing, if it "clearly and convincingly finds either (1) the record does not support certain specified findings or (2) that the sentence imposed is contrary to law." *State v. Worthen*, 2d Dist. Montgomery No. 29043, 2021-Ohio-2788, ¶ 13.

{¶ 80} A trial court has full discretion to levy any sentence within the authorized statutory range, and it is not required to make any findings or give its reasons for imposing a maximum or more than minimum sentence. *State v. Jones*, 2d Dist. Clark No. 2020-CA-8, 2021-Ohio-325, ¶ 85. In determining an appropriate sentence, the trial court may consider information beyond that strictly related to the conviction offense. *State v. Bowser*, 186 Ohio App.3d 162, 2010-Ohio-951, 926 N.E.2d 714, ¶ 15 (2d Dist.). This is because the court is no longer concerned with the narrow issue of guilt. *Id.* at ¶ 14; *State v. Wiles*, 2d Dist. Clark No. 2017-CA-69, 2018-Ohio-3077, ¶ 19. A court may consider, for example, the circumstances underlying the offense, information contained in a presentence investigation report, hearsay evidence, prior arrests, facts supporting a charge that resulted in an acquittal, and facts related to a charge that was dismissed under a plea agreement. *E.g., State v. McNeil*, 2d Dist. Clark No. 2019-CA-51, 2020-Ohio-3202, ¶ 14; *State v. Bodkins*, 2d Dist. Clark No. 2010-CA-38, 2011-Ohio-1274, ¶ 43; *Wiles* at ¶ 19.

{¶ 81} In exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 82} "When reviewing felony sentences that are imposed solely after considering the factors in R.C. 2929.11 and R.C. 2929.12, we do not analyze whether those sentences are unsupported by the record." *State v. McDaniel*, 2d Dist. Darke No. 2020-CA-3, 2021-Ohio-1519, ¶ 11, citing *State v. Dorsey*, 2d Dist. Montgomery No. 28747, 2021-Ohio-76, ¶ 18. We may not independently weigh the evidence in the record and substitute our judgment for that of the trial court concerning the sentence that best reflects compliance with those statutes. *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 42. Instead, the inquiry is simply whether the sentence is contrary to law. *Dorsey* at ¶ 18. A sentence is contrary to law when it falls outside the statutory range for the offense or if the sentencing court does not consider R.C. 2929.11 and 2929.12. *Id.*

{¶ 83} On appeal, Keister contends that, in imposing sentence, the trial court improperly considered whether he had engaged in trafficking in methamphetamine, a crime for which he was not charged, and his conduct during the pendency of the case, both of which the State discussed in its sentencing memorandum. Keister asserts that a lesser term of incarceration could have been imposed that would have adequately met the purposes and principles of felony sentencing.

{¶ 84} The record contradicts Keister's assertion that the court considered uncharged allegations of trafficking in methamphetamine or his conduct during the

pendency of the case.   At sentencing, the trial court expressly stated that it "is only taking into account what Mr. Keister was convicted of and does not – has reviewed the pre-sentence investigation as well as the sentence memorandum, is not considering anything exterior that may or may not have taken place throughout the trial as well as any indication of trafficking."

{¶ 85} Regardless, Keister's sentence was not contrary to law.   The stated minimum term of eight years in prison was within the statutory range for a felony of the second degree, *see* R.C. 2929.14(A)(2)(a), and the court correctly calculated the corresponding maximum term, *see* R.C. 2929.144(B)(1).   Keister acknowledges that the court was required to impose a mandatory sentence.   Keister's claim that his sentence was unsupported by the record is foreclosed by the Ohio Supreme Court's decision in *Jones.   See State v. Matthews*, 2d Dist. Montgomery No. 29079, 2021-Ohio-3694, ¶ 9.

{¶ 86} Keister's fourth assignment of error is overruled.

### VI. Conclusion

{¶ 87} Having overruled each assignment of error, the trial court's judgment is affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

EPLEY, J., concurs in part and dissents in part:

{¶ 88} I concur with the majority opinion save for the conviction of tampering with evidence.   In my view, the State's evidence did not support a conclusion that Keister had known of an actual or likely official investigation and acted with the purpose of impairing

the firearm's availability "in such proceeding or investigation."

{¶ 89} In a 6-1 decision, after finding a certified conflict existed among the Second and Ninth Districts, the Ohio Supreme Court confirmed there are three elements of tampering with evidence in violation of R.C. 2921.12(A)(1): "(1) knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11. In doing so, the supreme court responded affirmatively "whether a tampering conviction requires proof that the defendant impaired evidence in an investigation by tampering with evidence related to the investigation."

{¶ 90} The facts of the case at bar resemble those in *State v. Skorvanek,* 182 Ohio App.3d 615, 2009-Ohio-1709, 914 N.E.2d 418 (9th Dist.), the unsuccessful conflict case addressed in *Straley*. In *Skorvanek*, a request went out to stop a vehicle for an improper left-hand turn. When officers observed that vehicle drive by, they began to follow it and saw the driver throw something over the top of the car. The officers stopped the vehicle, and one of them returned to the area where the item had been thrown. A pill bottle containing heroin and various pills was found. The defendant was charged with and convicted of possessing oxycodone, heroin, Percocet, and Vicodin, tampering with evidence, and possessing drug paraphernalia and criminal tools. Skorvanek argued that his tampering conviction should be overturned because the pill bottle was unrelated to the traffic stop.

{¶ 91} The Ninth District mistakenly rejected the contention that the evidence had

to be related to the investigation, stating: "The fact that officers initially were following Skorvanek for a traffic violation does not detract from the evidentiary value of the pill bottle filled with heroin and multiple prescription drugs that he threw from this car." *Id.* at ¶ 23.

**{¶ 92}** Because the Ohio Supreme Court did not side with Skorvanek's argument, I agree with Keister that the State's evidence did not support a conclusion that Keister knew of an actual or likely official investigation and acted with the purpose of impairing the firearm's availability "in such proceeding or investigation." The Ohio Supreme Court emphasized the statute's language that the action must be taken "with purpose to impair its value or availability *as evidence in such proceeding or investigation*." (Emphasis added.) The court noted:

> In this instance, "such" investigation refers back to the investigation just specified, i.e., the one that that the defendant knows is ongoing or is likely to be instituted. Therefore, the evidence must relate to that investigation; otherwise, the word "such" loses all meaning. The state's argument that all evidence recovered in an investigation should be included in the ambit of the tampering statute would require us to change the language from "such" proceeding or investigation to "any" proceeding or investigation.

*Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, at ¶ 16. The supreme court held that "a conviction for tampering with evidence pursuant to R.C. 2921.12(A)(1) requires proof that the defendant intended to impair the value or availability of evidence that related to an existing or likely official investigation or proceeding." *Id.* at ¶ 19. "Likelihood is measured at the time of the act of alleged tampering," and it concluded that there was nothing in the record to suggest that the officers were conducting or likely to

investigate trafficking or possession of cocaine when Straley discarded the baggie. *Id.* Ultimately, the Court stated, "there is no need to expand the reach of the statute beyond its plain meaning."

**{¶ 93}** Shortly after *Straley* was rendered, we reversed a conviction for tampering with evidence based on the defendant's hiding a weapon while the vehicle in which he was a passenger was pulling over for a traffic stop. *State v. Wilcox*, 2d Dist. Clark No. 2013-CA-94, 2014-Ohio-4954. In *Wilcox*, a canine alerted on the passenger side of the vehicle while officers were checking for warrants and beginning to work on a traffic citation. A search led to the discovery of crack cocaine, heroin, and a handgun under the driver's seat. On appeal, we found insufficient evidence to support Wilcox's conviction for tampering with evidence, stating:

> Here, there was arguably an investigation in progress when Wilcox hid the handgun. The police officers' testimony shows that when they saw Wilcox lean over they immediately suspected a weapon. This suggests, at best, that an investigation regarding Wilcox's possession of a weapon was initiated a split-second before he actually placed the handgun under the driver's seat. The problem is that there is no evidence that Wilcox knew about this investigation or knew that it was likely. Therefore a reasonable juror could not find that Wilcox's purpose in putting the handgun under the seat was to impair its availability in the officer's investigation. Given the Supreme Court's decision in *Straley*, we must conclude that the record here does not support a conviction for tampering with evidence.

*Id.* at ¶ 26.

{¶ 94} Since *Straley*, the supreme court has acknowledged the difference between the concealment of evidence that would support a possession charge from the concealment of evidence related to a violent offense. In *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, 49 N.E.3d 1248, Barry's friend gave her a condom filled with heroin, which she hid in her vaginal cavity. Later, when driving with her friend and others, the police stopped her vehicle for traffic violations. After smelling marijuana, searching the vehicle, and speaking with all the occupants, an officer asked Barry if she had drugs concealed in her body. She eventually admitted to having the hidden drugs. Similar to *Straley*, the Ohio Supreme Court reversed Barry's conviction for tampering with evidence, reasoning that the State failed to prove that she was aware that an investigation into her drug trafficking and possession was likely when she concealed the drugs.

{¶ 95} The Ohio Supreme Court distinguished *Barry* in *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, in which the defendant burned his clothing following a murder in a residential neighborhood. The court found sufficient evidence that Martin had tampered with evidence, reasoning that, unlike *Barry* which involved a possessory offense, *Martin* involved a homicide, and a jury could have reasonably believed that a murderer would know that homicides "are highly likely to be discovered and investigated." *Id.* at ¶ 118. Our case law is consistent with this distinction. *See State v. Scott*, 2d Dist. Montgomery No. 27445, 2017-Ohio-9316 (evidence supported conclusion that defendant knew investigation was likely when the vehicles he tried to conceal were involved in a homicide); *State v. Bonaparte*, 2d Dist. Clark No. 2018-CA-61, 2019-Ohio-2030.

{¶ 96} I would find that *Straley, Wilcox,* and *Barry* require the reversal of Keister's

conviction for tampering with evidence. Keister was involved in a single-car crash that caused damage to a utility pole. Immediately afterward, Miniard, who as far as Keister knew was an unknown private citizen, stopped to check on his welfare. At that point, Keister could have reasonably expected that an official investigation of the car crash was likely. However, the firearm and other contraband with which Keister allegedly tampered was unrelated to the crash. As in *Wilcox* and *Barry*, the record does not support a conclusion that an investigation of possession offenses was under way or was likely when Keister put the gun and other items into the Amazon box and removed the box from the crash scene. Additionally, the State's evidence did not square with or support a belief that Keister's purpose in putting the gun and other contraband in the Amazon box and taking the box to the fence line was to impair its availability in an officer's official investigation of the crash.

**{¶ 97}** I note that, because Keister received concurrent sentences, this conclusion may be pyrrhic and has no effect on the length of Keister's aggregate sentence. Nonetheless, I respectfully dissent from the majority opinion in this respect.

. . . . . . . . . . . .

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Jon Paul Rion
Catherine H. Breault
Hon. Gerald Parker